UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Steve A. Licitra,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Phillipia Fletcher–DeNovellis,<br>    *Defendant*. | Civil No. 3:09cv685 (JBA)<br><br><br><br>February 24, 2012 |

RULING ON MOTION FOR SUMMARY JUDGMENT

On December 11, 2009, Plaintiff Steve Licitra filed an Amended Complaint [Doc. # 25] against Defendant Phillippia Fletcher–DeNovellis, claiming that Ms. DeNovellis violated his Fourteenth Amendment substantive due process rights (Count One) and committed the common law tort of intentional infliction of emotional distress ("IIED") (Count Two) by suspending Plaintiff without pay for three days from his job as a Personnel Officer with the Connecticut Department of Motor Vehicles ("DMV"). Defendant moves [Doc. # 45] for summary judgment on both counts. For the reasons that follow, Defendant's motion will be granted.

I.    Relevant Undisputed Facts[1]

Ms. DeNovellis is a Human Resources Specialist with the DMV; her duties include "reviewing and/or investigating allegations and/or complaints from customers and/or employees about employee misconduct [and] reviewing workplace issues involving violations of State and/or agency policies." (DeNovellis Aff., Ex. B to Def.'s Loc. R. 56(a)1

---

[1] The record on summary judgment consists of the transcript of Plaintiff's deposition, the affidavit of Ms. DeNovellis with attached exhibits, and Plaintiff's discovery responses. Plaintiff did not take the deposition of Ms. DeNovellis.

Stmt. ¶¶ 3–6.) Mr. Licitra is an Inspector with the DMV. (*Id.* ¶ 10, Licitra Dep., Ex. A to Def.'s 56(a)1 Stmt. at 24:5–25:16.)

### A.     April 21, 2006 Incident

On April 21, 2006, Mr. Licitra was assigned as a Greeter at Bradley International Airport ("Bradley") in his capacity as an Inspector and Law Enforcement Officer as part of the 2006 Commercial Vehicle Safety Alliance Annual Conference ("CVSA Conference"). (DeNovellis Aff. ¶ 11; Licitra Dep. at 44:8–47:21.) Mr. Licitra testified during his deposition that on April 21, 2006, he parked his state–assigned Ford Expedition on the road outside Bradley Terminal B, and walked into the baggage area looking for a table to which he had been instructed to report. (Licitra Dep. at 48:5–19.) When he could not find any table, he went up to the second floor of Terminal B, said good morning to the TSA agents stationed by the double glass doors, then walked through a metal detector at a security checkpoint and continued walking to the end of Terminal B. (*Id.* at 48:20–49:8.) A TSA agent approached Licitra in Terminal B, identified himself, and asked if Licitra had a Bradley identification badge; Licitra answered that he did not and explained that he was there for the CVSA Conference. (*Id.* at 49:8–20.)

Mr. Licitra further testified that he then went back out to where he had parked his vehicle and spoke with Sergeant Davidson from the DMV and Sergeant Shaw from the Connecticut State Police; he followed Sergeant Shaw back to the second floor of Terminal B. (*Id.* at 49:21–51:3.) Licitra remained outside the double doors of the Terminal while Sergeant Shaw spoke with a TSA agent; Sergeant Shaw then returned and informed Mr. Licitra that the TSA wanted to arrest Mr. Licitra. (*Id.* at 51:2–51:11.) After Sergeant Shaw asked for identification, Mr. Licitra walked back to his vehicle to retrieve his license and told

Sergeant Davidson that he was going to be arrested. (*Id.* at 51:8–52:7.) While he was at his vehicle, Assistant Homeland Security Director Bob Martineau and two plain–clothes TSA agents approached Mr. Licitra; Licitra testified that because they approached in "a fast–paced aggressive manner," he ordered them back to the curb. (*Id.* at 52:8–53:15.) After the TSA officers then identified themselves, Licitra went with Sergeant Shaw and the other officers to a room in "Troop W" at Bradley and was told that he was not allowed to leave. (*Id.* at 53:16–55:4.)

The officers told Mr. Licitra that he was being arrested; Licitra then called Sergeant Davidson to tell him "I'm getting arrested." (*Id.* at 55:5–21.) After contacting other DMV officials, a family member, and union president Bill Boucher, Licitra was read his Garrity and Miranda rights; he responded to questions and then signed a written statement. (*Id.* at 55:22–67:25.) Mr. Licitra was then told that he could leave, but that if the TSA officers found evidence of a security breach, that they would pursue a warrant for his arrest. (*Id.* at 67:25–68:8.) He received a copy of the sworn statement and left. (*Id.* at 68:9–69:25.) Mr. Licitra was reassigned from duty at Bradley, but testified that DMV Deputy Commissioner Anthony Portanova reassured him that the worst that would happen would be that he would receive a letter of reprimand. (*Id.* at 66:1–72:10.)

  B. DMV Investigation and Discipline

Ms. DeNovellis states in her affidavit that she was not present during the events at Bradley on April 21, 2006, but that she and DMV Human Resources Administrator Steven Shonta "were receiving updates as this Incident was developing." (DeNovellis Aff. ¶¶ 11–19.) She understood that TSA and DPS officials agreed not to press any federal charges against Mr. Licitra "provided that the DMV would handle the Incident

administratively." (*Id.* ¶ 20.) Ms. DeNovellis met with Mr. Shonta and DMV Commercial Vehicle Safety Division Captain John Herman "to discuss the Incident and to determine how the agency was going to proceed in handling it administratively." (*Id.* ¶ 22.) They decided that DeNovellis and Shonta would conduct an investigation and that statements and reports from the State Police, Homeland Security, and TSA officials would be provided to DeNovellis and Shonta through Captain Herman. (*Id.* ¶ 23.)

Ms. DeNovellis and Mr. Shonta subsequently received statements from Sergeant Davidson, who was in charge of Mr. Licitra's assignment at the time of the Incident; Carl Standen, who was working at the checkpoint through which Mr. Licitra passed; Maryanne Cyr, who was also working at the checkpoint; Transportation Security Officer Ellen Coughlin, who was also working at the checkpoint; Lead Transportation Security Officer Richard Cough, who was also working at the checkpoint; Supervising Transportation Security Officer Stephen Napoli, who was also working at the checkpoint; Deputy Commissioner Portanova; TSA Assistant Security Director Knapp; Homeland Security Assistant Security Director Martineau; Mr. Licitra; and Airport Police Officer Ostrowski. (*Id.* ¶¶ 24–28.) Ms. DeNovellis states in her affidavit that after reviewing all of the materials, she and Mr. Shonta concluded that Mr. Licitra failed to provide identification upon request and prove that he had the appropriate clearance to enter the Terminal B checkpoint while carrying a gun, and that he failed to cooperate with TSA officials. (*Id.* ¶ 29.) They concluded that these actions "violated and breached Federal Airport Security Regulations, the DMV Identification Badge Policy #201 and the DMV Statement of Values," and that Licitra's "behavior was unbecoming of a law enforcement officer." (*Id.*) DeNovellis and Shonta were considering recommending a ten–day suspension for Mr. Licitra. (*Id.* ¶ 30.)

On May 31, 2006, Ms. DeNovellis sent Mr. Licitra a letter notifying him of a pre–disciplinary, or Loudermill, hearing to be held on June 15, 2006, at which he could present his side of the incident, and informing him of the alleged violations, that they were considering a ten–day suspension, and that he had the right to union representation at the hearing. (*Id.* ¶ 31; Ex. 15 to DeNovellis Aff.) Prior to the Loudermill hearing, Union Steward Glenn Terlecki sent Ms. DeNovellis a request for the citation to the specific section of the Federal Airport Security Regulations that Mr. Licitra allegedly violated; Assistant Security Director Martineau e–mailed that information to Mr. Terlecki on June 14, 2006. (*Id.* ¶¶ 32–33; Exs. 12, 16 to DeNovellis Aff.)

Mr. Licitra, Mr. Terlecki, Union Representative Steve Cox, Mr. Shonta, and Ms. DeNovellis attended the Loudermill hearing on June 15, 2006, at which Mr. Licitra argued:

> that there was no criminal intent; there was no operational walk through prior to the CVSA event; the last time he went to Bradley International Airport was in 1999; he was not given any operational guidelines; there was no table set up there as he was told there would be; there was no indication from his Sergeant as to what he needed to do; he went upstairs to see what was going on; he was not stopped by the first TSA agent; and that he is known to be a fast walker. He also indicated that he cooperated with security officials when he was stopped. When asked if he was familiar with the DMV Identification Badge policy and the DMV Statement of Values he said that they were not given to him.

(DeNovellis Aff. ¶¶ 36–37.) Mr. Terlecki said at the hearing that Mr. Licitra was "a good worker," went out of his way to do work for the agency, helped with the annual "Blue Mass" religious service for law enforcement officers, did volunteer work, and got along with people. (*Id.* ¶ 37.) Ms. DeNovellis states in her affidavit that she and Mr. Shonta were aware of the fact that Mr. Licitra had, in fact, received a copy of the 2006 CVSA Conference Operational Plan "which explained his assignment, the uniform requirements, and provided emergency

5

contact telephone numbers, as well as a map showing how to get around Bradley International Airport clearly identifying gates and terminals," and that he had acknowledged receipt of the DMV Identification Badges policy and Statement of Values in 1996 and 1997. (*Id.* ¶ 38.)

Ms. DeNovellis and Mr. Shonta reviewed the information, discussed their findings with Captain Herman, concluded that "there was evidence of misconduct by Inspector Licitra sufficient to warrant the imposition of some type of disciplinary action, and recommended to Captain Herman that a three–day suspension would be appropriate. (*Id.* ¶¶ 39–40.) Captain Herman approved the three–day suspension, and in a letter dated July 24, 2006, Ms. DeNovellis informed Mr. Licitra that he would be suspended from duty without pay on August 15, 16, and 17, 2006. (*Id.* ¶¶ 41–42; Ex. 21 to DeNovellis Aff.)

Mr. Licitra testified that he grieved the suspension, and after arbitration was made whole for his lost wages. (Licitra Dep. at 120:7–122:7.) He also testified that he has now had to "[s]ee my career go down the tubes," and that he was told by individuals within the DMV that he would never be promoted because of this incident. (*Id.* at 138:1–139:11.) Mr. Licitra has not received any medical treatment, but testified that he contacted the DMV Employee Assistance Program due to his emotional distress because "my life was spiraling out of control." (*Id.* at 163:21–164:25.) Mr. Licitra also testified that "[t]here was no reason" for the three–day suspension and that it was "proven" by the arbitrator that there was no reason for it. (*Id.* at 154:8–157:1.)

II.   Discussion[2]

Ms. DeNovellis argues that she is entitled to summary judgment on Plaintiff's substantive due process claim because Plaintiff cannot demonstrate that he was deprived of a fundamental constitutional right or that she engaged in arbitrary or conscience–shocking action, that she is entitled to qualified immunity on the substantive due process claim, that no reasonable jury could find that she committed the tort of IIED, that the IIED claim is barred by Conn. Gen. Stat. § 4-165, and that if the Court grants summary judgment on the substantive due process claim, it should decline to exercise supplemental jurisdiction over the IIED claim.

A.   Substantive Due Process

Plaintiff clarifies in his Opposition [Doc. # 48] that he does not claim that Defendant violated his fundamental right in his state employment, but rather "the right not to be falsely condemned by a government official for wrongdoing the official knows was not committed." (Opp'n at 4.)   His counsel repeated at oral argument that the Fourteenth Amendment substantive due process right asserted by Plaintiff is the "right not to be falsely condemned." In claiming that Ms. DeNovellis' actions violated his constitutional right against false condemnation, Mr. Licitra relies entirely on *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir.

---

[2] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

7

2004), in which the First Circuit held that actions taken in contravention of the prohibition against deliberately fabricating evidence and framing individuals for crimes they did not commit "necessarily violate due process." The First Circuit affirmed the district court's denial of the defendants' motion to dismiss where the plaintiffs, who had been convicted of first-degree murder, had claimed a violation of their substantive due process rights by alleging in their complaint that prosecutors had "suborned false testimony from a key witness" and "suppressed exculpatory evidence in an effort both to cover up their own malefactions and to shield the actual murderers." *Id.*

Plaintiff argues that Ms. DeNovellis' conduct, "deliberately condemning an innocent man for wrongdoing she knew he had not committed, fits comfortably within the parameters of the sorts of conduct which federal courts have found violative of the substantive due process clause." (Opp'n at 4.) However, although Plaintiff testified at his deposition that "[t]here was no reason" for his three-day suspension, there is no evidence in the record from which a reasonable juror could infer that Ms. DeNovellis knew that Mr. Licitra had not committed a violation of DMV policies, yet nonetheless falsely condemned him for those violations. *Limone* held that allegations that prosecutors procured false testimony and suppressed exculpatory evidence so as to deliberately frame innocent individuals sufficed to state a substantive due process claim. 372 F.3d at 44–45. Nothing in the record here supports Plaintiff's claims of similar machinations on the part of Ms. DeNovellis. Despite maintaining that Ms. DeNovellis was wrong in her assessment of the evidence before her, Plaintiff points to nothing in the record that could support an inference that she falsified any of the evidence at the Loudermill hearing or that she deliberately framed Mr. Licitra for a crime he did not commit.

In order to succeed on his substantive due process claims, Plaintiff would also have to show that Ms. DeNovellis' actions were "arbitrary in the constitutional sense." *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 118 (1992)). "Mere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). The record on summary judgment demonstrates that Plaintiff cannot meet his burden in this respect, either. Again, Plaintiff relies almost entirely on his own deposition, in which he testified that there was no reason for his three–day suspension. Even if this were correct, there is nothing in the record that suggests DeNovellis acted in an inappropriate or "conscience–shocking" way in settling on her recommendation that Plaintiff be suspended without pay. Ms. DeNovellis stated in her affidavit that she reviewed all of the evidence available to her in making her decision, and Plaintiff does not produce any evidence that indicates any improper motive or arbitrary action on DeNovellis' part in reaching that decision.

Defendant's motion for summary judgment with respect to Plaintiff's substantive due process claim is therefore granted.

B.   IIED

Defendant argues that no reasonable jury could find that her actions were extreme and outrageous so as to meet the Connecticut standard for IIED, nor could a reasonable jury find that Plaintiff suffered severe emotional distress. "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society." *Appleton v. Bd. of Ed. of the Town of Stonington*, 254 Conn. 205, 210 (2000)

9

(internal quotation marks and citations omitted). Ordinarily, "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Parson v. United Tech. Corp.*, 243 Conn. 66, 89 (1997) (citations omitted). In the context of an ongoing employment relationship,

> individuals reasonably should expect to be subject to routine employment–related conduct, including . . . disciplinary or investigatory action arising from actual or alleged employee misconduct. . . . Thus, it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace. There are few things more central to a person's life than a job, and the mere fact of being demoted or denied advancement may be extremely distressing. That is simply an unavoidable part of being employed.

*Perodeau v. City of Hartford*, 259 Conn. 729, 757 (2002).

Plaintiff's evidence with respect to his IIED claim consists of his testimony that there was no reason for DeNovellis to recommend that he be suspended without pay for three days and that he suffered emotional distress as a result and contacted the Employee Assistance Program because he felt his life was "spiraling out of control." He points to no actions by DeNovellis that he claims were outrageous, or exceeded all bounds tolerated by decent society, beyond her decision to suspend him. Even if this disciplinary decision were motivated by some improper animus or made on the basis of faulty information, it does not constitute extreme or outrageous behavior within the context of an IIED claim and does not exceed what an employee may be expected to withstand in the context of his or her employment. *See Perodeau*, 259 Conn. at 757; *Parson*, 243 Conn. at 89.

Defendants' motion for summary judgment with respect to Plaintiff's IIED claim is therefore granted.

III.     Conclusion

For the reasons stated above, Defendant's motion [Doc. # 45] is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of February, 2012.